# EXHIBIT "B"

1

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3   DARRELL A. BRITTINGHAM        :

4            Plaintiff           :

5   v.                           :     CASE NO.

6   JOSEPH E. McGEENEY,          :     AMD 02 CV 4055

7   AND TOWN COUNCIL OF          :

8   CENTREVILLE, INC.            :

9            Defendants          :     Pages 1 - 145

10

11

12          Deposition of Joseph E. McGeeney

13              Centreville, Maryland

14          Thursday, February 26, 2004

15

16

17

18

19

20

21   Reported by:  Linda H. Cole, Notary Public
```

COPY

56

1    A    Unmarked unit.

2    Q    Tell me the type and the year.

3    A    Blue.  I want to say Impala -- we called it

4    the bomber -- blue -- it was an older model.  It was

5    like in the '80s.

6    Q    Did it have any writing on it at all?

7    A    No.

8    Q    Where were the lights in the vehicle?

9    A    Dashlight, a revolving dashlight.

10    Q    Red?

11    A    Blue.

12    Q    Anything in the back?

13    A    No.

14    Q    Any flasher lights in the back, you know,

15    strobes or anything like that?

16    A    No.  There might have been stop lights on

17    the back dash.

18    Q    When you turned onto Brown Street what did

19    you see?

20    A    I saw two guys ready to do battle.  One had

21    a machete to my left, and one had a large walking

Esquire Deposition Services

1    stick to my right.  They were each off to the side of

2    the street.

3        Q    You saw that as soon as you turned onto

4    Brown Street?

5        A    Pretty much.

6        Q    How far down the street were they?

7        A    Right at the corner of Hillside Drive.

8        Q    So halfway down the block?

9        A    Just about.

10        Q    And one you said was on your left and one

11    was on your right?

12        A    Correct.

13        Q    Do you know the names of those gentlemen?

14        A    The one on the right with the walking stick

15    was -- we call him Reds -- I want to say Joe Dawson.

16        Q    Why do you call him Reds?

17        A    That's his nickname.  Don't ask me how he

18    got that.  I don't know.  The other guy, I don't

19    recall -- Hawkins or something like that.

20        Q    Let me get this straight.  Reds was on the

21    left?

58

1        A    No.  On my right with a walking stick.

2        Q    Can you describe Reds for me?

3        A    African-American, freckles -- I think that's

4   how they got Reds; freckles pretty much all over his

5   face -- short hair, I think he's got a tint of red

6   with it, thin build, and maybe about five -- God, it's

7   been awhile -- maybe around five-10.

8        Q    What did he have in his hand?

9        A    A large walking stick maybe about four-foot

10  long.

11       Q    How old is he approximately?

12       A    I don't recall -- maybe in his 30s.

13       Q    How was that walking stick positioned in his

14  hands at that point in time?

15       A    He was just holding it in his hands ready to

16  do battle with it with the other guy.

17       Q    You're indicating with both hands?

18       A    Both hands.

19       Q    Kind of like holding a rifle at -- do you

20  know what port arms is?

21       A    No.  Just basically holding it with two

Esquire Deposition Services

59

1    hands in front of him.

2        Q    He was on the right side of Brown Street?

3        A    Correct.

4        Q    And Mr. Hawkins --

5        A    Which would be the east side.

6        Q    And Mr. Hawkins was on the left side of

7    Brown Street?

8        A    Correct.

9        Q    I presume he had the machete?

10       A    Correct.

11       Q    Can you describe Mr. Hawkins for me?

12       A    A little taller, weighed a little more than

13   Reds, I want to say maybe about six-one, maybe 200 to

14   220, somewhere in there, medium complexion, I believe.

15   I'm not real sure.  Reds, I'd dealt with him many

16   times.  This was my first -- only time that I'd had

17   anything to do with Mr. Hawkins, so I'm assuming

18   that's his name.  I'm guessing at that time that was

19   his name.  That's what I recall.  I'm really guessing

20   as far as his height and weight from what I'm trying

21   to remember that night.

60

1      Q    Do you know about how old he was?

2      A    40-ish.

3      Q    You said he had a machete in his hands?

4      A    Correct.

5      Q    Which hand?

6      A    I believe his right.

7      Q    How was he holding it?

8      A    He was putting it away under gunpoint into a

9  trunk of a car that was right there parked.

10     Q    This is when you first saw him?

11     A    When I first got out.  He was waving it in

12  his right hand, then he saw me, and he was putting it

13  into the trunk as I got out.

14     Q    Had you taken your gun out already?

15     A    When I got out of the car.

16     Q    What I'm trying to do, much like your

17  attorney did with Mr. Brittingham -- neither one of us

18  were there, and I try to do it -- I describe it as a

19  kind of photographic moment, photograph by

20  photograph by photograph, so I can get an idea of

21  where everything is happening and where everybody is

Esquire Deposition Services

62

1      A    Yes.

2      Q    And do you know the names of any of these

3   other individuals?

4      A    No.

5      Q    Can you tell me the number of individuals in

6   the vicinity?

7      A    Maybe up to about 10 or somewhere in that

8   neighborhood --

9      Q    Where were they located?

10     A    -- seven to 10.  They were watching the --

11  they were on the northern side of these two.

12     Q    So beyond them --

13     A    And there's a little hill there.

14     Q    So beyond them --

15     A    Excuse me.  There were some people on the

16  sidewalk all right in that general area.

17     Q    Were they on the east side or the west side?

18     A    I believe it was a little of both.

19     Q    So people on both sides?

20     A    Correct.

21     Q    When you saw that what went through your

63

1    mind?

2         A    I had to diffuse the situation.

3         Q    Were you worried that violence was about to

4    happen?

5         A    Definitely.

6         Q    So you pull around.  Did you radio back to

7    the police department?

8         A    Yes.

9         Q    What time did you radio back to the police

10   department?

11        A    I can't recall.

12        Q    What did you tell them?

13        A    I advised them that I did have subjects with

14   a machete and a walking stick and requested backup at

15   that time to expedite.

16        Q    Did they come back and tell you that they

17   acknowledged your transmission?

18        A    Yes.

19        Q    Did they tell you where backup was?

20        A    No.

21        Q    So again, you were still in the dark about

1      Q    Okay.  How about Hawkins, had you ever had

2    any dealings with him before?

3      A    No.

4      Q    Did you consider him dangerous with a

5    machete?  These sound like obvious questions, but --

6      A    He was very cooperative after I secured him.

7    I mean at the time yes, he was a threat, but he

8    immediately got rid of the weapon on my demand.

9      Q    You said he put it in the trunk or

10   something.

11     A    Correct.

12     Q    Let me ask you this.  When you first got out

13   of the car and drew your weapon at him, there was a

14   car in the vicinity near him?

15     A    Yeah.  There were a couple of cars parked

16   right on that side.

17     Q    Was he near a car?

18     A    Yeah.  The very last car apparently was his,

19   and it was parked.

20     Q    And it was parked north or south side of

21   Hillside?

1      A      It was on the south side of Hillside, but on

2    the west side of Brown -- the southwest corner of

3    Hillside and Brown.

4      Q      Where was he positioned with regard to that

5    car?

6      A      To the rear of the car, right on the corner.

7      Q      Was the trunk opened or closed at the time

8    you first drew your weapon?

9      A      I don't recall whether it was open or

10   closed.

11     Q      At some point the trunk was opened?

12     A      Correct.

13     Q      Did it concern you when the trunk was open?

14     A      No.  I was focused on him with the machete.

15     Q      Did you worry when he went towards the

16   trunk?

17     A      No.  His actions kind of indicated to me

18   that he was putting it away.

19     Q      In what regard?

20     A      He just immediately put it in there and shut

21   the trunk.

1      Q    How far was he away from you at that point

2   in time -- still 20 feet?

3      A    Within maybe 15.  I was advancing slowly

4   towards him.

5      Q    What time did you call in for the backup

6   after you got the call?

7      A    I immediately called in for backup.

8      Q    Do you know what time of day that was?

9      A    It was in the morning, 2:30-ish.

10     Q    You can't give me any better time than that?

11     A    No.

12     Q    When he put the machete into the trunk, do

13  you know what time that was?

14     A    No.

15     Q    After he put the machete in the trunk, did

16  he close the trunk?

17     A    Yes.

18     Q    Then what happened?

19     A    I holstered my weapon and secured him in

20  handcuffs.

21     Q    Let's get to that.  Did you walk over to

72

1   him, or did you have him come over to you?

2        A    I walked over to him.

3        Q    Was he still by his car?

4        A    Yes.

5        Q    Did you still have your weapon out as you

6   walked towards him?

7        A    No.  I indicated I had holstered my weapon.

8        Q    Did you take out any other means of

9   self-defense?

10        A    No.

11        Q    No baton, no ASP, nothing like that?

12        A    No.

13        Q    Did you have a flashlight or anything in

14   your hands?

15        A    No.

16        Q    It was dark, I take it?

17        A    The streetlights were on.

18        Q    Where was the closest streetlight to Mr.

19   Hawkins?

20        A    I don't recall.  They are throughout that

21   area.

73

1      Q      And we heard Mr. Brittingham testify that it

2   was dry out that night.  Is that correct?

3      A      Yes.

4      Q      Was it cold?

5      A      I don't remember it being too cold.

6      Q      Do you recall what you were wearing?

7      A      Uniform.

8      Q      I understand, but did you have a jacket or a

9   coat on?

10      A      I don't believe I did.

11      Q      You walked over to Mr. Hawkins.  How long

12   did it take you to go from your car to Mr. Hawkins?

13      A      Seconds.

14      Q      When you got to Mr. Hawkins what did you do?

15      A      I placed him under arrest.

16      Q      How did you do that?

17      A      I just told him he was under arrest.

18      Q      Did you take any action physically towards

19   him?

20      A      Did he?

21      Q      No, did you.

Esquire Deposition Services

74

1    A    I placed him in handcuffs.

2    Q    And you had one set on you at that time?

3    A    That's correct.

4    Q    Was Reds still on the other side of the

5  street?

6    A    Yes.

7    Q    Were the other individuals still in the

8  area?

9    A    Yes.

10   Q    What did you do after placing Mr. Hawkins in

11 handcuffs?

12   A    Had him sit on the curb.

13   Q    Where at?

14   A    Right where I arrested him.

15   Q    So that would be on the southwest corner of

16 Brown and Hillside?

17   A    Correct.

18   Q    What did you do then?

19   A    I just told him to stay there, and I went

20 over to diffuse Reds' mouth.

21   Q    He was still yapping?

Esquire Deposition Services

1    at Mr. Hawkins?

2          A    No.  I'm looking straight at him.

3          Q    You've got me confused, but that's not

4    unusual.

5          A    I'm looking west.

6          Q    Right.

7          A    He's on the west side of the street.  I've

8    got Reds down to my left on the curb me with my left

9    hand on his shoulder.  I can reason with Reds.

10          Q    So you're facing the street, he's to your

11   left side and you're looking straight across at Mr.

12   Hawkins?

13          A    Correct.

14          Q    Are you talking to Reds at that point in

15   time trying to calm him down?

16          A    Yes.

17          Q    What is he saying to you, and what are you

18   saying to him?

19          A    I'm just telling him to stop the shouting

20   and trying to diffuse the situation.  He was just

21   yelling different things, still wanting to do battle

1    with the guy, and telling him that when they get

2    through this I'll get you and things like that.

3        Q    And you're telling him to shut up --

4        A    Basically, to calm down.

5        Q    How long did that go on?

6        A    Pretty much until my backup arrived or

7    fairly close to it.  They were whoofing pretty much

8    the whole time towards the backup.  When they got

9    there, then I had the dealing with the third

10   individual.

11       Q    Mr. Brittingham?

12       A    Correct.

13       Q    When did you first become aware of Mr.

14   Brittingham -- well, let me ask you this.  Before

15   becoming aware of Mr. Brittingham's presence somewhere

16   in the vicinity, how long had you been on the scene?

17       A    It seemed like forever when you're in a

18   situation like that.

19       Q    Was it kind of a tense situation?

20       A    Oh, yes.  A couple of minutes.

21       Q    How did you first become aware of Mr.

86

1    any response from the group?

2        A    No.  I was still focusing on these two

3    suspects.

4        Q    Then what did you hear next?

5        A    Well, I did see them pointing in my

6    direction, and there were some other people on the

7    other side of his car on the east side of Brown Street

8    and they also pointed in my direction.

9        Q    Did he start walking towards you at that

10   point?

11       A    Yes, he did.

12       Q    So he'd have been somewhere around 30 feet

13   away from you at that point in time.  Is that correct?

14       A    30-some feet, maybe 40.

15       Q    You said he was shouting some racial

16   epithets?

17       A    At what time?

18       Q    What did you next hear him say?

19       A    He was just shouting at -- he wanted me to

20   go arrest these individuals for throwing bottles at

21   his car.

1    Q    Other than that, did you hear him say

2  anything else at that point in time?

3    A    He just kept repeating basically that he

4  wanted me to go arrest them.

5    Q    Specifically, what did he say?

6    A    Those fucking niggers are throwing bottles

7  at my car.

8    Q    Did you say anything in response to that?

9    A    I told him that I was busy, and I would get

10  with him as soon as I possibly could.

11    Q    When you told him you were busy how far away

12  from you was he at that point in time?

13    A    Within arms' reach.

14    Q    So he had already come up towards you?

15        (Witness nods.)

16    Q    That's a yes?

17    A    Yes, sir.

18    Q    How many times did he say words to the

19  effect niggers or whatever you said are throwing

20  bottles at my car?

21    A    Several times.

88

1      Q    Two, three, four, five?

2      A    More than that, probably about a half dozen

3   or more.

4      Q    Six or more times?

5      A    About that.

6      Q    While he's walking towards you?

7      A    Yes, sir.

8      Q    With African-Americans on either side of the

9   street?

10     A    That's correct.

11     Q    With you there with one suspect right in

12  front of you or right with you?

13     A    Two suspects.

14     Q    Well, one is across the street.  Correct?

15     A    It's still a problem.

16     Q    And one is right next to you?

17     A    Yes, sir.

18     Q    Had you ever known Mr. Brittingham before

19  that day?

20     A    No, sir.

21     Q    Had you ever seen him around?

89

1        A    Not that I recall.

2        Q    When he was shouting this stuff, other than

3    you saying that one time I'll be with you or whatever

4    it was you said --

5        A    No, sir.  I did not say that one time.

6        Q    How many times?

7        A    I had to tell him multiple times, and I had

8    to even push him away from me because he was on my

9    gun side.

10       Q    So you pushed him away from you?

11       A    Not push, arm stretch to back him off of me.

12    I never pushed him, just get my arm between he and I

13    so he doesn't come as close as he was.

14       Q    So you put up a stop sign essentially and he

15    stopped?

16       A    Chest high.

17       Q    Did he stop?

18       A    He would back up, and he would still demand

19    that I go arrest these individuals.

20       Q    Same language?

21       A    A few times.

1      Q    Now as he walked towards you what

2  observations did you make?

3      A    When he got out he was unsteady on his feet.

4  He seemed to -- I think he might have leaned against

5  his car when he was coming around the back.  I smelled

6  alcohol when he got close enough, and I knew he had

7  been drinking.

8      Q    You said he was unsteady on his feet.  What

9  specifically did you observe?  Did he fall down?

10     A    No.

11     Q    In what manner was he unsteady on his feet?

12     A    Just a little wobbly.

13     Q    Had you ever seen him walk before?

14     A    No, sir.

15     Q    Did you know what his condition of walking

16  before that night was?

17     A    No, sir.

18     Q    You say a little wobbly.  Did you notice

19  anything with regard to either one of his knees?

20     A    No.

21     Q    So he walked over to you.  How long did it

1    take him to get from his car to the position where you

2    put up your hand to stop him?

3         A    A minute or two.

4         Q    And during that time -- these six or more

5    times, he's shouting?

6         A    Thereabouts.

7         Q    And did you ever tell him shut up and be

8    quiet or anything like that?

9         A    I told him to keep quiet, that I would

10   handle his situation as soon as I could.

11        Q    How many times did you tell him that?

12        A    Several.

13        Q    Did he make any response to you?

14        A    He was still agitated.  He wanted me to

15   handle it right then and there.

16        Q    How did you know he was agitated -- just

17   because he kept repeating it?

18        A    Basically.

19        Q    When you told him to stop, he stopped.

20   Correct?

21        A    No.

1   Q He kept coming?

2   A He would come back several times, and I'd

3 just have to put my hand up so he'd stay away from my

4 weapon as well.

5   Q So he was on your right side?

6   A Correct.

7   Q So he'd come up, you'd put up the stop, he'd

8 back off, and then he'd come again?

9   A Correct.

10   Q How many times did that happen?

11   A A few times.  As he was shouting he'd back

12 away and he'd turn around, and as he's talking to the

13 individuals then he'd come back.  The whole time I'm

14 just trying to focus on these two individuals, because

15 he's handcuffed and he could run off at any time, and

16 this one's not handcuffed and I'm trying to keep an

17 eye on him, and his car is in the middle of the

18 street.  At that point, I just told communications to

19 have backup step it up.

20   Q Were you worried?

21   A Yeah, I was worried.

93

1     Q     Concerned?

2     A     Very concerned.

3     Q     Now at some point your backup arrived.  Is

4  that correct?

5     A     Yes.

6     Q     Do you know what time they got there?

7     A     No.

8     Q     The backup, was it only Deputies Heddinger

9  and Greene?

10    A     Correct.

11    Q     Did they come in one car?

12    A     No.

13    Q     In two cars?

14    A     That's correct.

15    Q     What direction did they come from?

16    A     The same direction as me.

17    Q     So they all came up Little Kidwell and

18  then --

19    A     Onto Brown.

20          (Exhibit Nos. 1 through 4 marked.)

21          (Break taken.)

1   answer.

2        A    Other than the speed, and the way he turned

3   the corner.

4        Q    How did he turn the corner?

5        A    I told you close to the curb.

6        Q    Did he squeal tires coming around?

7        A    I don't recall.

8        Q    Did he skid?

9        A    Pardon me?

10       Q    Did he skid as he came around the corner?

11       A    No.

12       Q    He didn't drive weaving or anything like

13  that coming up the road that you saw.  Is that

14  correct?

15       A    There wasn't time to observe that.

16       Q    Now how close did he get to you before you

17  said you smelled alcohol on him?

18       A    As I indicated before, within arms' reach.

19       Q    What kind of alcohol did you detect on his

20  breath?

21       A    I think it was beer.

Esquire Deposition Services

1     Q     And it's your testimony at trial, you said

2     he had an odor of alcohol.   Is that correct?

3     A     I'm not --

4     Q     You read the transcript, didn't you?

5     A     I don't remember every word of it, but I'm

6     sure there was an odor of alcohol.

7     Q     Was your testimony at trial truthful?

8     A     Yes.

9     Q     And accurate?

10    A     Yes.

11    Q     And as complete as possible when you

12    answered the questions?

13    A     Yes, sir.

14    Q     You were asked by the State's Attorney in

15    there what observations of him that you had that led

16    you to believe that he was under the influence of

17    alcohol.   Do you remember that?

18    A     I'm sure it was in there, but I don't recall

19    it.

20    Q     And do you recall saying that his eyes were

21    red?

1      A     I just normally typically associate it with

2  someone that's been drinking.

3      Q     Do you know what his eyes were like before

4  December 19th?

5      A     No, sir.

6      Q     Did you make the observation that his eyes

7  were red before you arrested him?

8      A     Yes.

9      Q     Did you make the observation that his eyes

10  were red when he came up to you the first time?

11     A     I don't know if it was the first time.

12     Q     When was it that you made that observation?

13     A     I don't recall.

14     Q     Before you threw him to the ground?

15     A     It was before he was placed under arrest.

16     Q     When before -- how long before?

17     A     Minutes.

18     Q     Where was he in relation to you when you

19  made that observation?

20     A     Within arms' reach.

21     Q     Was he standing on the sidewalk?  Was he

1    standing on the street?  Where was he?

2         A    Right next to me.

3         Q    Where was the streetlight positioned at that

4    point -- the closest streetlight?

5         A    I don't recall.  They were pretty much all

6    around.

7         Q    Was the streetlight behind him or in front

8    of him?

9         A    I don't recall.

10        Q    Now as he walked to you, other than noticing

11   the little unsteadiness that you indicated, he didn't

12   trip -- correct -- as he walked towards you?

13        A    Not that I recall.

14        Q    He didn't fall down?

15        A    No.

16        Q    He didn't stumble.  Correct?

17        A    No.

18        Q    What training did you have in alcohol or

19   drug detection?

20        A    A couple of classes throughout my career.

21        Q    You weren't specifically trained in drug and

1    alcohol recognition?

2        A    No, sir.

3        Q    Were you certified in any police department

4    as a drug and alcohol recognition expert?

5        A    No, sir.

6        Q    Had you made drug and alcohol arrests

7    before?

8        A    Many.

9        Q    How many alcohol arrests had you made

10   before?

11       A    A couple hundred.

12       Q    A couple hundred DWI cases?

13       A    Uh-huh.

14       Q    How many guilty pleas?

15       A    95 or 96 percent.

16       Q    Any not guilties in there?

17       A    A couple.

18       Q    Any people that you suspected were guilty

19   and found not guilty?

20       A    Yeah.

21       Q    How many?

106

1    A    A couple.

2    Q    Just a couple?

3    A    Yeah.  Not many, a couple.

4    Q    Now as I understand it one of the concerns

5    you had with Mr. Hawkins across the street was he

6    could take off and run at any time.  Correct?

7    A    That was one of my concerns, yes, sir.

8    Q    Was anybody else in the crowd threatening

9    anything?  Other than just jabbering, was anybody

10   yelling threats back and forth?

11   A    No.

12   Q    Now you're saying you advised him more than

13   once that you were busy and would get to him in due

14   time?

15   A    Yes, sir.

16   Q    How many times did you tell him that?

17              MR. HAMILTON:  Asked and answered.

18   Q    Go ahead.

19   A    A few.

20   Q    Before that time you had already concluded,

21   as we've indicated, that he was under the influence of

108

1    A    Immediately to my right.

2    Q    How far away?

3    A    A couple of feet.

4    Q    What was he doing at that point in time?

5    A    He was running his mouth more than anything.

6    Q    Saying what?

7    A    I don't recall exactly verbatim.

8    Q    Can you say substantively what was he

9  saying?

10    A    It's what I mentioned before.  He said that

11  several times.

12    Q    Still?

13    A    He still wanted -- demanded me to go arrest

14  them.  That was his biggest complaint.

15    Q    Now after your backup arrived what happened

16  next?

17    A    We secured the two individuals that I

18  arrested in the patrol cars.

19    Q    And Mr. Brittingham remained on the scene?

20    A    Yes, sir,

21    Q    What patrol cars did you put them in -- put

109

1     these two guys in?

2          A    Reds or Joe Dawson was in my patrol car.

3     Hawkins was, I believe, in Detective -- I mean PFC

4     Greene's -- Deputy Greene's patrol car.

5          Q    What time did they actually get there?

6          A    I don't know.

7          Q    Can you tell me how long you'd been on the

8     scene by the time they got there?

9          A    It seemed like forever.

10         Q    You just can't tell me?

11         A    In an explosive situation like that it

12    seemed like forever, but I'm sure it was only minutes.

13         Q    Now after you get them in the car, Mr.

14    Brittingham is still over by this pole you said.    Is

15    that correct?

16         A    Correct.

17         Q    What did you do at that point in time?

18         A    After securing both subjects, the second one

19    in handcuffs, and putting them in the car, I

20    immediately advised the deputies that the individual

21    over there was going to be placed under arrest for

110

1    disorderly conduct and hindering police.

2         Q    What had he done to hinder you?

3         A    He kept taking my focal point away from the

4    suspects and the investigation I had there with the

5    assault with the weapons, demanding that I go arrest

6    the individuals, coming close to my weapon, and just

7    generally interfering with the arrest and the

8    investigation.

9         Q    You weren't intending to arrest him for DWI

10   at that time?

11        A    That was probably part of it.  I advised

12   them that he was under suspicion that he was under the

13   influence.

14        Q    Now DWI was the most serious drinking and

15   driving offense back then.  You were charging him with

16   21902A.  Is that correct?

17        A    It's traditional that at the State's

18   Attorney's Office you would charge him with A and B,

19   21092A and 21092B, or just DWI and DUI like that.

20        Q    You didn't do any field sobriety test with

21   him.  Is that correct?

113

1    Q    So hindering you told him, and you may have

2  said also --

3    A    Hindering and disorderly conduct, is what I

4  believe I told him.

5    Q    You told him hindering and disorderly

6  conduct?

7    A    Correct.

8    Q    You didn't say anything about DWI?

9    A    Not at that time.

10   Q    How far away from him were you at that point

11 in time?

12   A    I had walked up to him directly.

13   Q    How many feet away from him were you?

14   A    Two or three.

15   Q    Where were Greene and Heddinger at that

16 point in time?

17   A    Greene was to my left, and I believe

18 Heddinger was behind him.

19   Q    How far away were they?

20   A    You mean --

21   Q    Were they with you, or were they going to go

114

1    with you?

2         A    Yeah.  I advised them that we were going to

3    place him under arrest for hindering and disorderly.

4         Q    And when you did that, when you said I'm

5    placing you under arrest for hindering and maybe

6    disorderly --

7         A    There was no maybe about it.

8         Q    You told him hindering and disorderly.  What

9    happened then?

10        A    I went to place him in the handcuffs, I

11   grabbed his arm, and he immediately backed up and

12   threw his arms backwards in resistance.

13        Q    So his arms are above his head backwards?

14        A    He just flung them back.

15        Q    He didn't try to hit you?

16        A    No.

17        Q    So he just flung them back, and he stepped

18   back.  Is that correct?

19        A    Correct.

20        Q    And then as I understand it from your

21   reports, you grabbed him and threw him to the ground.

115

1    Is that correct?

2        A    When I saw that he wasn't going to go

3    peacefully, yes.

4        Q    How did you grab him and throw him to the

5    ground?

6        A    I just took him to the ground.

7        Q    Tell me how.

8        A    I put his body onto the ground, and he went

9    down face first.

10       Q    You twisted him around and threw him down?

11       A    Basically.

12       Q    So you threw him to the ground?

13       A    Correct.

14       Q    Did you then have to secure him by getting

15   on top of him?  That's normal arrest procedure.  Isn't

16   that correct?

17       A    It's possible.

18            MR. HAMILTON:  Objection.

19       Q    It's not what's possible.  Did you do that,

20   sir?

21            MR. HAMILTON:  Objection.

Esquire Deposition Services

116

1    A    I was behind him.

2    Q    Did you get your knee into his back while he

3    was on the ground?

4    A    That's possible also.

5    Q    Possible doesn't cut it.  Is it a yes or a

6    no?

7    A    I don't recall.

8         MR. HAMILTON:  Objection.

9    Q    So you have nothing personalized that Mr.

10    Brittingham testified to that he was on the ground and

11    you jammed your knee into his back.  Is that correct?

12    A    Like I said, it's possible.  I was trying to

13    get his hands handcuffed.

14    Q    Did you hear him shouting anything about his

15    shoulder or back?

16    A    No, sir.

17    Q    He didn't say anything to you?

18    A    No, sir.

19    Q    Did he say anything while he was on the

20    ground?

21    A    He just didn't understand why he was getting

1    arrested when they were throwing bottles at his car.

2        Q    That's the only thing he said to you.

3        A    That's all I recall.

4        Q    Did you ever try to say just calm down, stop

5    it and I'll let you up, or anything like that?

6        A    I advised him to calm down or else he would

7    be pepper sprayed.

8        Q    Where were Greene and Heddinger during this

9    time?

10        A    Greene was helping me effect the arrest.

11        Q    Which side of you was he on?

12        A    He was to my left.

13        Q    How was he trying to help you effectuate the

14    arrest?

15        A    He had both of his arms underneath his body

16    face down on the ground, and we were trying to get his

17    arms behind him so I could get the handcuffs on him.

18        Q    Now when you went to grab him and throw him

19    down, you've already indicated his hands are back and

20    you didn't feel like he was trying to assault you or

21    anything like that.  Is that correct?

118

1       A    He was just resisting the arrest.

2       Q    Well, he's stepping back and his hands were

3  up?

4       A    Correct.

5       Q    And at that point in time, you told him

6  hindering and obstruction were what he was under

7  arrest for.   Correct?

8       A    Hindering and disorderly.

9       Q    I'm sorry, disorderly.  And instead of just

10  saying hold on pal, you grabbed him and threw him to

11  the ground.  Is that correct?

12      A    After I tried to place him under arrest, I

13  did take him to the ground, correct.

14      Q    You threw him to the ground?

15      A    He went to the ground.

16      Q    Did he go of his own volition, or did you

17  throw him to the ground?

18      A    No.  I put him on the ground.

19      Q    So you threw him down.  Did you throw with

20  force, as much force as you could generate?

21                  MR. HAMILTON:  Objection.

1    arrested anybody for hindering before?

2        A    Many times.

3        Q    What are the elements of the common law

4    offense of hindering?

5        A    I don't recall exactly all of the elements,

6    but it's just hindering the investigation of police

7    duties.

8        Q    That's it?

9        A    Right off the top of my head.

10        Q    You said you can't remember all of the

11    elements.  Do you know how many elements there are?

12                MR. HAMILTON:  Objection.

13        A    I don't recall all of the elements.  It's

14    been several years.

15        Q    Now how long was he on the ground before you

16    were able to get his arms secured?

17        A    Not that long.

18        Q    30 seconds?

19        A    No.  Longer than that.

20        Q    How much longer?

21        A    A minute or two.

122

1    Q    So he was basically laying on the ground --

2    A    Three at the most.

3    Q    Two or three minutes?

4    A    Two or three minutes.

5    Q    Between the two of you?

6    A    Correct.

7    Q    And his form of resisting arrest as you said

8    was to put his arms underneath his body and keep them

9    there so you couldn't grab them?

10    A    After he had backed up and flung his arms

11    up, yes.

12    Q    So that's the only thing he was doing on the

13    ground -- is that correct -- and he was yelling at you

14    why was he being arrested?

15    A    Correct.

16    Q    And at no time did you stop, stand back, and

17    say here's why you're being arrested, calm down --

18    correct -- you just continued?

19    A    I advised him why he was being arrested.

20    Q    You just still continued to try to grab his

21    arms?

Esquire Deposition Services

123

1    A    Correct.

2    Q    Now after -- well, let me ask you this.  Did

3  Greene get one of his arms out and you got the other

4  one out?

5    A    Yes, sir.

6    Q    You got his right arm, I take it?

7    A    Correct.

8    Q    And Greene got his left arm?

9    A    That's correct.

10   Q    And whose cuffs did you use?

11   A    It wasn't mine; mine was already used.  I

12  believe they were Greene's.

13   Q    Did he put them on or did you?

14   A    It was probably a joint effort.

15           (Off the record.)

16   Q    I take then that after you got him into

17  cuffs, did you then lift him up to get him to his

18  feet?

19   A    Yes.

20   Q    What happened then?

21   A    Tried to take him to the patrol car, and he

1    started kicking.

2         Q     Kicking before he got to the patrol car?

3         A     Yes.

4         Q     What did he kick at?

5         A     Well, we got him to the patrol car, and he

6    was kicking at me and Officer Greene.  He did kick me,

7    and he kicked Officer Greene.  It was a very minor

8    thing.

9         Q     On the way to the car?

10        A     And at the car.

11        Q     At the car, okay.  How did you get him into

12   the car?

13        A     Opened the rear door and put him in the car.

14        Q     Did you shove his head against the car in

15   any fashion?

16        A     No, sir.

17        Q     Were you able just to push him down or slide

18   him down?

19        A     That, as well as -- this is the driver's

20   side of the vehicle -- one of the officers went around

21   to the other side, I believe it was Deputy Greene, and

125

1    he went over to pull him in from the other side.

2         Q    I thought Greene was with you?

3         A    He was, but now Heddinger is trying to help

4    us, too.

5         Q    So the three of you?

6         A    He's kicking frantically at us.

7         Q    What was he saying during this time?

8         A    I don't recall.

9         Q    So you got him into the car and closed the

10   door, I take it.  Correct?

11        A    Yes, sir.

12        Q    How long did it take you to do that?

13        A    A minute or two.

14        Q    After getting him into the car, what

15   happened?

16        A    He started thrashing about and kicking the

17   patrol car window, the back left rear window.  I

18   remember seeing the frame of the door coming away from

19   the frame of the car.  That's how hard he was kicking

20   the window.  So we had to reopen the door and secure

21   his feet, which we did with leg restraints.

1     Q    And after you got leg restraints on him,

2  what happened?

3     A    He was transported to the Maryland state

4  police barracks.

5     Q    What time did he leave the scene?

6     A    I don't recall.

7     Q    You didn't go to the Maryland State police,

8  did you?

9     A    Yes, I did.

10     Q    You went over there with him?

11     A    Not with him.

12     Q    Who transported him?

13     A    I believe it was Deputy Heddinger.  I think

14  he was a corporal at the time.

15     Q    And how did you get over there?

16     A    In my patrol car.

17     Q    You had somebody in the patrol car.  Is that

18  correct?

19     A    Correct.

20     Q    Who did you have?

21     A    Reds or Joe Dawson.